UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CAPRIOLE, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>  Defendants. | Case No. 20-cv-02211-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Docket Nos. 42, 67 |

## I.    INTRODUCTION

John Capriole ("Mr. Capriole"), Martin El Koussa ("Mr. El Koussa"), and Vladimir Leonidas ("Mr. Leonidas") (collectively "Plaintiffs") bring this class action to compel Uber Technologies, Inc. ("Uber") to comply with Massachusetts labor laws and to classify Uber drivers as employees. Uber and Dara Khosrowshahi ("Mr. Khosrowshahi), the President and CEO of Uber, are named as Defendants. Plaintiffs assert that, as a result of Uber's alleged misclassification of drivers, they have been forced to bear the expenses of their employment, been denied Massachusetts minimum wage for hours worked, been deprived of overtime pay, and—as is particularly relevant to their current motion—been denied paid sick leave. This case was originally filed in federal court in Massachusetts but was transferred to the Northern District of California pursuant to a forum selection clause in Uber's driver agreement. In September 2019, Plaintiffs filed a motion for a preliminary injunction in Massachusetts, but that motion was denied and is currently on appeal before the First Circuit. Plaintiffs subsequently filed a new Emergency Motion for Preliminary Injunction, which is now pending before this Court. Defendants in turn have filed a Motion to Compel Arbitration.

1

## II. BACKGROUND

A. Factual Background

Mr. Capriole is a resident of Haverhill, Massachusetts. *See* Second Amended Complaint ("SAC") ¶ 7, Docket No. 77. He has worked there as an Uber driver since April 2016. *Id.* ¶¶ 7, 35. Mr. El Koussa is a resident of Boston Massachusetts. *Id.* ¶ 8. He has worked there as an Uber driver since July 2014. *Id.* Mr. Leonidas is a resident of Braintree, Massachusetts. *Id.* ¶ 9. He has worked there as an Uber driver since May 2016. *Id.* Uber is a corporation with its headquarters in San Francisco. *Id.* ¶¶ 11, 15. Mr. Khosrowshahi is the President and Chief Executive Officer of Uber; Plaintiffs assert that he is "responsible for Uber's pay practices and employment policies." *Id.* ¶ 12. (Together, Uber and Mr. Khosrowshahi are referred to as "Defendants.")

Plaintiffs bring this class action on behalf of all "individuals who have worked as Uber drivers in Massachusetts who have not released all of their claims against Uber." SAC ¶ 10. As noted above, they contend that "Uber has misclassified its drivers, including Plaintiffs John Capriole, Martin El Koussa, and Vladimir Leonidas as independent contractors when they should be classified under Massachusetts law . . . as employees." *Id.* ¶ 2. Because Uber drivers are not classified as employees, they are required "to pay business expenses (including but not limited to the cost of maintaining their vehicles, gas, insurance, phone and data expense, and other costs)," they are not guaranteed minimum wage or overtime premiums, and they do not receive paid sick leave, as would otherwise be required under Massachusetts law. *Id.* ¶ 2. Massachusetts requires employers to provide "a minimum of one hour of earned sick time for every thirty hours worked by an employee . . . but employees shall not be entitled to use accrued earned sick time until the 90th calendar day following commencement of their employment." MASS. GEN. LAWS. ch. 149, § 148C; *see also* SAC ¶ 2. Employees may earn and use up to forty hours of paid sick time per calendar year. MASS. GEN. LAWS. ch. 149, § 148C.

Plaintiffs contend that because drivers are not classified as employees, many of them "struggle to support themselves" and, as a result, "feel the need to continue working . . . even if they feel ill." FAC ¶¶ 3, 4. While such a dilemma might be problematic in normal times, in light

1    of the "worldwide crisis" generated by COVID-19, Uber's employee-classification and sick-leave

2    policies are exacerbating a life-threating global emergency. *Id.* ¶ 4.  Without the option of paid

3    sick leave, Uber drivers who cannot afford to make a different choice "will continue working and

4    risking exposing hundreds of riders who enter their car[s] on a weekly basis to this deadly

5    disease." *Id.* ¶ 5.  Such actions wholly contravene the advice of public health officials, who have

6    "advised that anyone who feels ill should stay home and not go to work." *Id.* ¶ 4.  Thus, Plaintiffs

7    contend that Uber's policies "creat[e] an immediate danger, not only to Uber drivers, but to the

8    general public as well." *Id.* ¶ 5.

B.    Arbitration Agreement

In moving to compel arbitration, Uber cites two arbitration agreements, which are contained in Uber's 2015 Technology Services Agreement ("2015 Agreement") and the 2020 Platform Services Agreement ("2020 Agreement").  *See* Reply in Support of Motion to Compel Arbitration at 1, Docket No. 83.  It appears that Mr. El Koussa and Mr. Leonidas "agreed to individual arbitration in the 2020 Platform Access Agreement . . . and did not opt out."[1]  *Id.*  Mr. Capriole, however, agreed to both the 2015 and the 2020 Agreement, but opted out of the 2020 Agreement.  *See* Motion to Compel Arbitration ("MTC") at 4, Docket No. 67 (citing Exh. 7 to Declaration of Brad Rosenthal ("Rosenthal Decl."), Docket No. 69-7).  Uber contends that, because Mr. Capriole did not originally opt out of the 2015 Agreement, he remains bound to arbitrate his claims because of a provision of the 2020 Agreement which informs any drivers opting out of that agreement that they remain bound by any existing arbitration agreement to which they are a party with Uber.  *See* MTC at 5.  Uber's contention is discussed in greater detail below.  *See* Section III.B.1.

In Uber's 2015 Technology Services Agreement, Section 15.3 sets forth the terms of the company's Arbitration Provision:

> IMPORTANT: This Arbitration Provision will require you to
> resolve any claim that you may have against the Company or Uber

---

[1] Presumably, based on when they began driving, Mr. El Koussa and Mr. Leonidas also agreed to the 2015 Agreement; but neither party contends it changes the analysis here.

3

on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA")), California Labor Code § 2698 *et seq.* ("PAGA") against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.

. . .

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration.  Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

. . .

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**  Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and

4

> not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that all or part of the Class Action Waiver [is] unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.
>
> . . .
>
> **Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (*e.g*[.]*,* UPS, Federal Express, etc.), or by hand delivery to:**
>
> > **Legal**
> > **Rasier, LLC**
> > **1455 Market St., Ste. 400**
> > **San Francisco CA 94103**

2015 Agreement, Docket No. 69-1 (emphasis and formatting in the original).

C.     Procedural Background

Mr. Capriole filed a class action complaint in the U.S. District Court for the District of Massachusetts on September 12, 2019. *See* Docket No. 1. (Mr. Capriole was the sole Plaintiff named in the original complaint.) On September 19, 2019, he filed a Motion for Preliminary Injunction, seeking essentially the same relief sought in the current motion for a preliminary injunction: an injunction prohibiting Uber from "classifying its drivers in Massachusetts as 'independent contractors'" and an order directing "Uber to classify its drivers as employees and comply with Massachusetts wage laws." *See* Docket No. 4 at 11–12. Uber filed a Motion to Compel Arbitration and to Stay Proceedings (pending arbitration). *See* Docket No. 10. It also filed a Motion to Transfer [the] Case to [the] Northern District of California on October 17, 2019. *See* Docket No. 12.

On March 12, 2020, while the previously filed motions were still pending, Mr. Capriole filed an Emergency Motion for Leave to File a First Amended Complaint, in order to add a claim

5

relating to paid sick leave. *See* Docket No. 35. Judge Talwani granted the motion for leave to file an amended complaint on March 18, 2020. *See* Docket No. 3. On March 20, 2020, Judge Talwani denied Mr. Capriole's Motion for a Preliminary Injunction, *see* Docket No. 41. On March 23, 2020, Mr. Capriole filed a new Emergency Motion for Preliminary Injunction (which is now pending before this Court following transfer of the case, *see* Docket No. 42). The following day, Mr. Capriole filed a Motion for Leave to File Second Amended Complaint. *See* Docket No. 43. That Complaint sought to add Mr. El Koussa and Mr. Leonidas (who had filed declarations in support of the Emergency Motion for Preliminary Injunction) as named Plaintiffs and to add "an additional statement of fact, that Plaintiff Capriole has driven across state lines while driving for Uber Technologies, Inc." *Id.*

On March 27, 2020, the Massachusetts Attorney General was granted permission to file an amicus curiae brief in support of Plaintiff's Emergency Motion For Preliminary Injunctive Relief. *See* Docket Nos. 44–46. On March 30, 2020, Mr. Capriole appealed the denial of his Motion for a Preliminary Injunction to the First Circuit Court of Appeals. *See* Docket No. 51.

On March 31, 2020, Judge Talwani granted Defendants' Motion to Transfer and transferred the case to this Court, where it was related to *Verhines v. Uber Technologies, Inc.* (Case No. 3:20-cv-01886-EMC). Mr. Capriole's outstanding Emergency Motion for Preliminary Injunction and Defendants' Motion to Compel Arbitration were set for a telephonic hearing on April 22, 2020. *Id.* The Court also granted Mr. Capriole's Motion for Leave to File [a] Second Amended Complaint. *See* Docket No. 76. The Second Amended Complaint, which added Mr. El Koussa and Mr. Leonidas as named Plaintiffs, was filed on April 10, 2020. *See* Docket No. 77.

The Court heard the parties' arguments on Plaintiffs' Emergency Motion for Preliminary Injunction and Defendants' Motion to Compel Arbitration on April 22, 2020. *See* Docket No. 89. At the hearing, the parties were directed to meet and confer in an effort to reach a resolution with respect to Plaintiffs' Preliminary Injunction in view of the resolution of the preliminary injunction motion reached by the parties in *Verhines*. *Id.* The Court took the matters under submission. *Id.* On April 30, 2020, the parties submitted a joint case management statement indicating that the two sides had not been able to reach a resolution as to the preliminary injunction and that Plaintiffs

6

1  seek a ruling on the preliminary injunction motion from the Court.

## III.     DISCUSSION

A.     Legal Standards

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes "a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citing 9 U.S.C. § 2); *see also Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (quoting 9 U.S.C. § 2). Courts "must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

To determine "the validity of an arbitration agreement, federal courts apply state law contract principles." *Lau v. Mercedes-Benz USA, LLC*, No. CV 11-1940 MEJ, 2012 WL 370557, at *2 (N.D. Cal. Jan. 31, 2012) (citing *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002)). However, arbitration agreements may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339.

Typically, "the question whether an issue is arbitrable . . . is 'an issue for judicial determination . . . .'" *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citing *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)). In other words, "there is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability." *Oracle Am., Inc.*, 724 F.3d at 1072. However, where "the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate" may be decided by an arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). "Such clear and unmistakable evidence of agreement to arbitrate arbitrability might include . . . a course of conduct

7

1  demonstrating assent . . . or . . . an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011).

Arbitration agreements may also contain waivers of class action procedures that require parties to pursue their claims individually. "In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Sys.*, 138 S. Ct. at 1619.

B. <u>Analysis</u>

The first question presented here is which motion the Court should resolve first, Plaintiffs' Motion for Preliminary Injunction or Defendants' Motion to Compel Arbitration. As Judge Chhabria recently noted in a case involving similar claims brought against Lyft, "[i]t would not be appropriate to plow ahead on the motion for a preliminary injunction before ruling on [Defendant's] motion to compel." *Rogers v. Lyft, Inc.*, No. 20-CV-01938-VC, 2020 WL 1684151, at *3 (N.D. Cal. Apr. 7, 2020). The Ninth Circuit has explained that a district court's ability to grant injunctive relief prior to arbitration is limited; a "district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process." *Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010). *Toyo Tire* further stated that its holding was consistent with the majority of the Ninth Circuit's sister circuits, which had emphasized the preservation of the status quo in such cases. *Id.* (citing, *e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1050–55 (4th Cir. 1985) ("[W]e conclude that the language of § 3 [of the FAA] does not preclude a district court from granting one party a preliminary injunction to preserve the status quo pending arbitration."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton*, 844 F.2d 726, 726–28 (10th Cir. 1988) (affirming district court's grant of preliminary injunction to preserve status quo until arbitration panel takes jurisdiction)). Because the injunctive relief sought here would upend, rather than preserve, the status quo and would not preserve the meaningfulness of the arbitration process, consideration of injunctive relief prior to deciding Uber's Motion to Compel Arbitration would be improper. *Cf. O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1090 (9th Cir. 2018) (reversing class certification because arbitration

1  agreements found enforceable). Accordingly, the Court turns first to the question whether to grant

2  Defendants' Motion to Compel Arbitration.

### 1. Is Mr. Capriole Bound by the Arbitration Agreements?

Before compelling arbitration, the Court must determine that the parties actually consented to resolve disputes through arbitration. "'[T]he first principle that underscores all of our arbitration decisions' is that '[a]rbitration is strictly a matter of consent.'" *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)). Thus, "[a] court may compel arbitration of an issue, including threshold issues, only after first determining for itself that the parties in fact agreed to do so." *Lee v. Postmates Inc.*, No. 18-CV-03421-JCS, 2018 WL 6605659, at *5 (N.D. Cal. Dec. 17, 2018), *motion to certify appeal granted*, No. 18-CV-03421-JCS, 2019 WL 1864442 (N.D. Cal. Apr. 25, 2019) (citing *Granite Rock*, 561 U.S. at 299). Where, as here, a party argues that they are not bound by an arbitration agreement because they have opted out of an agreement that might otherwise bind them, courts have seen fit to address the opt-out issue prior to compelling arbitration. *See, e.g.*, *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 897 (N.D. Cal. 2018) (examining plaintiffs' "novel legal argument" related to opting out of arbitration agreement prior to compelling arbitration despite extremely expansive language as to the scope of arbitration agreement); *Lee*, 2018 WL 6605659, at *5–6 (discussing whether plaintiffs opted out of arbitration agreement prior to compelling arbitration despite the fact that agreement stated: "Postmates and Contractor mutually agree that any and all disputes or claims between the parties will be resolved in individual arbitration.").

As noted above, there is no contention that Mr. El Koussa or Mr. Leonidas opted out of arbitrating their claims against Uber; however, Mr. Capriole did opt out of the 2020 Agreement. Thus, the Court must determine whether he is nonetheless bound to arbitrate his claims because he did not opt out of the 2015 Agreement. Uber contends that he is. Uber relies on two provisions in the 2020 Agreement to argue that Mr. Capriole is still bound by the 2015 Agreement. First, part (c) of Section 13.8 ("Your Right to Opt Out of This Arbitration Provision") of the 2020

Agreement provides:

> If you opt out of this Arbitration Provision and at the time of your receipt of this Agreement you *were bound by an existing agreement to arbitrate disputes* arising out of or related to your use of our Platform and Driver App, that existing arbitration agreement will *remain in full force and effect*.

2020 Agreement, Section 13.8(c), Docket No. 69-4 (emphasis added). Because Mr. Capriole signed the 2015 Arbitration Agreement, but did not opt out of it within 30 days (or ever), he had at the time of the 2020 Agreement an "existing agreement to arbitrate" his disputes with Uber. Opting out of the 2020 Agreement does not operate to opt him out of the prior 2015 agreement. *See, e.g.*, *Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 185 (D. Mass. 2018) (concluding plaintiff was bound by earlier arbitration agreement despite the fact he opted out of a subsequent arbitration agreement which contained a similar provision to the one here).

In addition, Section 13.2 ("Limitations on How This Arbitration Provision Applies") of the 2020 Agreement provides:

> If, at the time of your receipt of this Agreement, *you were bound by an existing arbitration agreement* with us, that arbitration agreement will *continue to apply* to any pending litigation, *even if you opt out of this Arbitration Provision*.

2020 Agreement, Section 13.2, Docket No. 69-4 (emphasis added). As noted above, Mr. Capriole filed this lawsuit on September 12, 2019. *See* Docket No. 1. Mr. Capriole thus remains bound by the 2015 Agreement.

    2.        Does the FAA Apply to Uber's Arbitration Agreement?

While the FAA is a "liberal" policy that favors arbitration, *Epic Systems*, 138 S. Ct. at 1621, the FAA contains an express exception. Section 1 of the Act provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

Plaintiffs contend that this Section 1 exemption (the "transportation worker exemption") from the FAA applies to them. As the party opposing arbitration, Plaintiffs have the burden of proving that the exemption applies. *See, e.g.*, *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220,

227 (1987) ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."). To prove that the exemption applies, Plaintiffs must establish that a "contract of employment" exists and that they are part of a "class of workers engaged in foreign or interstate commerce." *See* 9 U.S.C. § 1. The Supreme Court has counseled that the exception is to be interpreted narrowly. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 106 (2001) ("The statutory context in which the 'engaged in commerce' language is found, *i.e.,* in a residual provision, and the FAA's purpose of overcoming judicial hostility to arbitration further compel that the § 1 exclusion be afforded a narrow construction.").

The critical issue is whether Uber drivers are "engaged in interstate commerce." That is a question for the court to decide. In *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019), the Supreme Court explained that "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *Id.* at 537.

In *Circuit City*, the Supreme Court faced the question of how broadly to interpret the Section 1 exemption to the FAA. In concluding that only employment contracts for transportation workers (as opposed to all employment contracts) are exempt from the FAA, the Court distinguished between the phrases "affecting commerce" or "involving commerce" (used in Section 2 to describe the general coverage of the FAA) and "engaged in commerce" (used in Section 1 to describe the scope of the exemption). It noted that "the words 'involving commerce' evidence the congressional intent to regulate to the full extent of its commerce power," *Circuit City*, 532 U.S. at 114. In contrast, the words "'engaged in commerce' are understood to have a more limited reach." *Id.* at 115; *see also id.* at 118 (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)) ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"). As Judge Chhabria noted in *Rogers*, the phrase "engaged in commerce" includes not everyone whose work might generally *affect* commerce, but "'only persons or activities within the flow of interstate commerce,' meaning 'the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer.'" *Rogers*, 2020 WL

11

1684151, at *5 (quoting *Gulf Oil*, 419 U.S. at 195).

In order to bring themselves within the narrower meaning of "engaged in interstate commerce," Plaintiffs allege both that Uber drivers sometimes cross state lines while transporting passengers and also that Uber drivers frequently pick up and drop off passengers at airports, thereby placing themselves within the flow of interstate commerce. *See* Opposition to Motion to Compel Arbitration ("MTC Opp.") at 4, 16, Docket No. 78. As to crossing state lines while transporting passengers, only Mr. Capriole alleges that he has done so. *See* Declaration of John Capriole ("Capriole Decl.") ¶ 7, Docket No. 16-8. However, the relevant inquiry is not whether an individual driver has crossed state lines, but whether the *class* of drivers crosses state lines. *See Lee v. Postmates Inc.*, No. 18-CV-03421-JCS, 2018 WL 4961802, at *8 (N.D. Cal. Oct. 15, 2018), *motion to certify appeal granted*, No. 18-CV-03421-JCS, 2019 WL 1864442 (N.D. Cal. Apr. 25, 2019) (quoting *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402 (6th Cir. 1988)) ("the concern was not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce").

On that point, Uber has provided evidence that only 2.5% of "all trips fulfilled using the Uber Rides marketplace in the United States between 2015 and 2019 . . . started and ended in different states." Contreras Decl. ¶ 4. In Massachusetts, that number is even smaller: "[o]f all trips fulfilled using the Uber Rides marketplace in Massachusetts between 2015 and 2019, 99.7% of these trips began and ended in Massachusetts, while the other 0.3% of all such trips started and ended in different states." *Id.* ¶ 5. And for Mr. Capriole himself, the number is roughly as small: only "0.4% of Mr. Capriole's total trips crossed state lines." Rosenthal Decl. ¶ 43.

With respect to Plaintiffs' contention that Uber drivers are engaged in interstate commerce because they play a central role in transporting people to and from airports, *see* MTC Opp. at 16 n.28 ("Plaintiffs have all provided innumerable rides to and from the airport."); *see also id*. at 4 (noting seven million TNC [Transportation Network Company] rides to and from Boston Logan Airport in 2018), Uber has provided data indicating that "10.1% of all [Uber] trips taken in the United States in 2019 began or ended at an airport," *see* Contreras Decl. ¶ 4.

A small number of courts have concluded that when transportation workers occasionally

cross state lines, they may be "interstate transportation workers within the meaning of § 1 of the FAA." *Int'l Bhd. of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 957 (7th Cir. 2012); *see also id.* ("Although Illini Concrete was primarily engaged in operations within Illinois, its truckers occasionally transported loads into Missouri. This means that the truckers were interstate transportation workers within the meaning of § 1 of the FAA as interpreted by *Circuit City*."). Other courts have declined to extend the exemption to "workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be unregulated." *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005) (discussing the examples of "an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town"). In *Hill*, the court faced the question whether Hill, "an account manager who as part of his job duties transports merchandise across the Georgia/Alabama border," should be considered "a member of a 'class of workers engaged in interstate commerce' within the meaning of the [FAA]." *Id.* The Eleventh Circuit explained:

> To broaden the scope of § 1's arbitration exemption to encompass any employment disputes of a worker employed by a company whose business dealings happen to cross state lines, would allow § 1's exception to swallow the general policy requiring the enforcement of arbitration agreements as pronounced in § 2 of the FAA.

*Id.* Nonetheless, at least one court has distinguished *Hill* on the grounds that the "transportation work [in *Hill*] was incidental to the plaintiff's employment as an account manager; whereas here, Plaintiffs engage solely in transportation work, driving passengers on intrastate and interstate roads." *Cunningham v. Lyft, Inc.*, No. 1:19-CV-11974-IT, 2020 WL 1503220, at *7 (D. Mass. Mar. 27, 2020).

Two federal courts have addressed the precise issue at bar, which was presented in similar cases involving Lyft drivers. In *Cunningham v. Lyft, Inc.*, No. 1:19-CV-11974-IT, 2020 WL 1503220 (D. Mass. Mar. 27, 2020), Judge Talwani concluded that Lyft drivers are engaged in interstate commerce and thus covered by the Section 1 exemption, in part because they take people to and from the airport. *See Cunningham*, 2020 WL 1503220, at *6–7 (citing, *inter alia*, *Palcko v.*

13

1   *Airborne Express, Inc.*, 372 F. 3d 588, 593 (3d Cir. 2004) (holding supervisor of drivers of

2   package transportation and delivery company engaged in interstate commerce); *Waithaka v.*

3   *Amazon.com, Inc.*, 404 F. Supp. 3d 335 (D. Mass. 2019) (finding last mile delivery driver engaged

4   in interstate commerce), appeal docketed, No. 19-1848 (1st Cir. Aug 30, 2019); *Walling v.*

5   *Jackson Paper Co.*, 317 U.S. 564, 568 (1943) (holding that goods remain in interstate commerce

6   where there is a practical continuity of movement)).[2]

7        In *Rogers*, Judge Chhabria reached the opposite result, concluding that "the fact that Lyft

8   drivers frequently pick up and drop off people at airports and train stations" does not mean "that

9   they are, as a class, 'engaged in' interstate commerce." *Rogers*, 2020 WL 1684151, at *6. In

10  reaching that conclusion, Judge Chhabria found the Supreme Court's ruling in *United States v.*

11  *Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep.*

12  *Tube Corp.*, 467 U.S. 752 (1984), to be controlling. In relevant part, *Yellow Cab* involved anti-

13  trust claims that the taxi company was attempting to limit the number of taxis in Chicago. The

14  government argued that this effort involved interstate commerce (and thus the taxi company was

15  subject to the Sherman Act) because people use taxis "to transport themselves and their luggage to

16  [and from] railroad stations in Chicago." *Yellow Cab*, 332 U.S. at 230. However, the Supreme

17  Court rejected this argument, noting that none of the companies "serve[d] only railroad

18  passengers, all of them being required to serve 'every person' within the limits of Chicago. They

19  ha[d] no contractual or other arrangement with the interstate railroads. Nor [we]re their fares paid

20  or collected as part of the railroad fares. In short, their relationship to interstate transit [wa]s only

21  *casual and incidental*." *Id.* at 231 (emphasis added).[3] Judge Chhabria concluded that "[l]ike the

---

[2] To the extent that Plaintiffs rely on cases relating to workers who transported packages that regularly travel between states, the Court finds those cases unavailing here because the packages at issue in those cases regularly traveled across state lines, whereas the passengers transported here rarely do. *See, e.g.*, *Rittmann v. Amazon.com, Inc.*, 383 F. Supp. 3d 1196, 1200 (W.D. Wash. 2019) (finding Amazon delivery drivers to be subject to the Section 1 exemption because Amazon is widely known "to transport goods across the country to consumers in a couple of days").

[3] The Court distinguished those facts from an additional non-compete agreement, which related to the transportation of passengers solely between train stations in Chicago; it concluded that that agreement *did* implicate interstate commerce because where "persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not

14

drivers in *Yellow Cab*, Lyft drivers' 'relationship to interstate transit is only casual and incidental.'" *Rogers*, 2020 WL 1684151, at *7 (quoting *Yellow Cab*, 332 U.S. at 231). Accordingly, the Section 1 exemption did not apply.

Other courts have found Section 1 of the FAA does not apply to similarly situated workers. *See e.g.*, *Magana*, 343 F. Supp. 3d at 899 ("[T]here is no allegation that he engaged in interstate commerce under the definition of the narrowly-construed term. The Agreement is therefore not exempt from the FAA under 9 U.S.C. § 1 because Magana is not a transportation worker engaged in interstate commerce."); *Lee v. Postmates Inc.*, 2018 WL 6605659, *7 (N.D. Cal. Dec. 17, 2018) ("Postmates couriers do not fall within the transportation worker exception because Lee failed to show that couriers are sufficiently 'engaged in ... interstate commerce.'"); *Wallace v. Grubhub Holdings Inc.*, 2019 WL 1399986, *3–4 (N.D. Ill. March 28, 2019) (finding that food delivery drivers are not transportation workers exempted under § 1); *Rogers v. Lyft Inc.*, Case No. CGC-20-583685 (Sup. Ct. Cal., April 30, 2020) (available at Docket No. 92-1 in *Capriole*).

The Court finds *Rogers* and the line of cases declining to find Section 1 applicable persuasive. The statistics cited by Uber demonstrate that interstate rides given by Uber drivers in Massachusetts is not only incidental – they are rare. Uber drivers do not perform an integral role in a chain of interstate transportation. Uber drivers do not fall within the Section 1 exemption to the FAA because they are not "engaged in interstate commerce" within the meaning of that Section. Accordingly, the FAA applies to the arbitration agreements at issue here.

3. <u>Does the Preliminary Injunction Sought Herein Constitute a Public Injunction Which Cannot Be Compelled to Arbitration?</u>

Plaintiffs contend that even if Section 1 does not apply, the relief sought by Plaintiffs constitutes a public injunction, which cannot be waived by an arbitration agreement. The Court

---

make that portion of the trip any less interstate in character." *Yellow Cab*, 332 U.S. at 228. The Court explained that the conspiracy specifically targeting transportation between rail stations was "clearly a part of the stream of interstate commerce" because the tax rides were merely portions of broader interstate trips by train. *Id.* By contrast, the broader conspiracy to limit competition among cabs in Chicago generally did not come within the realm of interstate commerce because taxis were "required to serve every person within the limits of Chicago" – the interstate part of their work was only "casual and incidental." *Id.* at 231 (internal quotation marks omitted).

1   must first decide whether this issue should be decided by the Court or an arbitrator. As noted

2   above, generally, "the question whether an issue is arbitrable . . . is 'an issue for judicial

3   determination . . . .'" *Mohamed*, 848 F.3d at 1208 (citing *Oracle*, 724 F.3d at 1072). In other

4   words, "there is a presumption that courts will decide which issues are arbitrable; the federal

5   policy in favor of arbitration does not extend to deciding questions of arbitrability." *Oracle*, 724

6   F.3d at 1072. However, where "the parties clearly and unmistakably provide otherwise, the

7   question of whether the parties agreed to arbitrate" may be decided by an arbitrator. *AT&T Techs.*,

8   475 U.S. at 649. There is no such clear and unmistakable provision here.

9   As noted above, the 2015 Agreement contains a broad delegation clause which requires

10  that all disputes, subject to several narrow exceptions, be resolved by an arbitrator, even including

11  those pertaining to "the enforceability, revocability or validity of the Arbitration Provision." *See*

12  2015 Agreement. However, it does provide that "disputes regarding the enforceability,

13  revocability or validity of the Class Action Waiver may be resolved only by a civil court of

14  competent jurisdiction and not by an arbitrator." *Id.* In addition, the 2015 Agreement states that

15  "[t]he Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any

16  basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve

17  any claim or issue any relief on a class, collective, or representative basis." *Id.*[4] The 2015

18  Agreement also directs that where the Court determines "all or part of the Class Action Waiver" to

19  be unenforceable, it will retain the portion of the class, collective, and/or representative action that

20  cannot be compelled to arbitration. *Id.*

21  Because Plaintiffs contend the relief sought herein constitutes a public injunction, they

22  essentially assert this is equivalent to a collective or representative action, and this is a matter to be

23  resolved by the Court. As Judge Chhabria held in *Rogers* on nearly identical language in the Lyft

24  contract, "the arbitrator handles everything related to individualized relief," while the court

---

[4] The 2020 Agreement contains similar language: "Notwithstanding any other provision of this Arbitration Provision or the JAMS Rules, disputes in court or arbitration regarding the validity, enforceability, conscionability or breach of the Representative Action Waiver, or whether the Representative Action Waiver is void or voidable, may be resolved only by the court and not by an arbitrator." *See* 2020 Agreement.

"decid[es] the enforceability of the waiver of non-individualized relief and then retain[s] whatever (if anything) withstands the across-the-board waiver." Rogers, 2020 WL 1684151, at *8. As there is no clear and unmistakable delegation to arbitration on the issue of waivability of the putative claim for public injunction, the Court addresses the merits.

Although *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), and *Epic Systems Corporation v. Lewis*, 138 S. Ct. 1612 (2018), have made clear that class action waivers are permissible, actions which seek a public injunction under California law cannot be waived. *Cf. Roberts v. AT&T Mobility LLC*, No. 15-CV-03418-EMC, 2018 WL 1317346, at *7 (N.D. Cal. Mar. 14, 2018), *aff'd*, No. 18-15593, 2020 WL 774368 (9th Cir. Feb. 18, 2020) ("Public injunction claims under, *e.g.*, 17200, are more akin to a representative PAGA claim than a Rule 23 class action."). In *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), the California Supreme Court held that a waiver of public injunctive relief "in *any* contract—even a contract that has no arbitration provision" is "unenforceable under California law." 2 Cal. 5th at 962; *see also Blair*, 928 F.3d at 827 (quoting *McGill*, 2 Cal. 5th at 962). Because the rule applies to both arbitration and non-arbitration agreements, the Ninth Circuit has concluded that it is not preempted by the FAA. *Blair*, 928 F.3d at 827. Plaintiffs contend the public injunction exception to arbitration applies here.

However, Plaintiffs seek a public injunction under Massachusetts, not California law. MTC Opp. at 2. Judge Talwani, in denying Plaintiffs' original Motion for Preliminary Injunction, concluded:

> Unlike the consumer protection statutes at issue in *McGill*, the Massachusetts Wage Act includes no provisions for public injunctive relief. Instead, the statutory scheme allows a plaintiff to 'institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits . . .'" M.G.L. c. 149, § 150. The statute explicitly contemplates class-wide relief but includes no provisions that allow for injunction for the public benefit.

Order Denying Plaintiff's Motion for Preliminary Injunction, Docket No. 41 at 4. Although Plaintiffs appealed that ruling to the First Circuit (where it remains pending), this court finds

17

1 Judge Talwani's ruling is persuasive and will abide by it subject to review should the First Circuit
2 reverse.
3 Moreover, although the Court need not reach the question, Plaintiffs' argument that "the
4 Massachusetts Supreme Judicial Court ["SJC"] would follow the California Supreme Court in
5 *McGill*," if given the opportunity to address the question, faces an uphill battle even if *McGill*
6 applied. As the Ninth Circuit noted in *Blair*:

> One key difference between a private and public injunction is the primary beneficiary of the relief. Private injunctions "resolve a private dispute" between the parties and "rectify individual wrongs," though they may benefit the general public *incidentally*. By contrast, public injunctions benefit "the public *directly*" . . . but do not otherwise benefit the plaintiff . . . .

928 F.3d at 824 (emphasis added) (quoting *McGill*, 2 Cal. 5th at 955) (internal citations omitted). A growing number of cases have thus rejected application of the public injunction exception to classification question, finding such disputes to be matters of private dispute. *See, e.g.*, *Magana*, 343 F. Supp. 3d at 901 (quoting *McGill*, 2 Cal. 5th at 955) (concluding that the relief sought by plaintiffs was not a public injunction because "any benefit to the public would be derivate of and ancillary to the benefit to DoorDash's employees"); *Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745, 755 (Ct. App. 2019), *review denied* (Nov. 13, 2019) ("public interest and any incidental benefit to the public from ensuring Quest's compliance with wage and hour laws d[id] not transform Clifford's private UCL injunctive relief claim into a public one under the definitions of public and private injunctive relief articulated by our Supreme Court in *Broughton, Cruz*, and *McGill*").

Judge Schulman of the San Francisco Superior Court in *Rogers v. Lyft Inc.*, Case No. CGC-20-583685 (Sup. Ct. Cal., April 30, 2020) (available at Docket No. 92-1 in *Capriole*) and Judge Chhabria in *Rogers*, *supra*, have rejected the very same argument raised by Lyft drivers. The Court understands plaintiffs' argument that the classification error committed by Uber has enormous public consequences, including the potential impact upon public health. But thus far no court has held that such indirect consequences (even if established as a matter of fact, a matter highly controverted in view of the potential unintended consequences upon drivers' eligibility for

18

federal benefits under the Families First Coronavirus Response Act and the Coronavirus Aid, Relief, and Economic Security Act) render this suit one for public injunction.

## IV. CONCLUSION

Mr. Capriole is bound by Uber's 2015 Arbitration Agreement, and Mr. Leonidas and Mr. El Koussa are bound by the 2020 Arbitration Agreement. Section 1 of the FAA does not apply to Plaintiffs. Currently, there is no *McGill* rule under Massachusetts law that would prohibit arbitration of the injunctive relief that Plaintiff seeks. Accordingly, the Court **COMPELS** Plaintiffs' claims to arbitration and denies Plaintiffs' Motion for Preliminary Injunction.

This order disposes of Docket Nos. 42, 67.

**IT IS SO ORDERED**.

Dated: May 13, 2020

_____
EDWARD M. CHEN
United States District Judge