**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN CAPRIOLE, MARTIN EL KOUSSA, and VLADIMIR LEONIDAS, Individually and On Behalf of Others Similarly Situated, *Plaintiffs-Appellants*, <br><br> v. <br><br> UBER TECHNOLOGIES, INC.; DARA KHOSROWSHAHI, *Defendants-Appellees.* | No. 20-16030 <br><br> D.C. No. 3:20-cv-02211-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted October 16, 2020
San Francisco, California

Filed August 2, 2021

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
Circuit Judges, and Richard K. Eaton,[*] Judge.

Opinion by Judge Wardlaw

---

[*] Richard K. Eaton, Judge for the United States Court of International Trade, sitting by designation.

## SUMMARY[**]

### Federal Arbitration Act

The panel affirmed the district court's order compelling arbitration in a putative class action requesting a preliminary injunction prohibiting Uber from classifying drivers in Massachusetts as independent contractors and an order directing Uber to classify its drivers as employees and comply with Massachusetts wage laws.

Plaintiffs, Massachusetts residents who have worked as Uber drivers since at least May 2016, filed a putative class action in the District Court for the District of Massachusetts on behalf of all "individuals who have worked as Uber drivers in Massachusetts who have not released all of their claims against Uber." When they signed up to become Uber drivers, Plaintiffs agreed to Uber's 2015 Technology Services Agreement, which advised Plaintiffs of a mandatory arbitration agreement ("Arbitration Provision"), governed by the Federal Arbitration Act ("FAA").

Uber moved to compel arbitration, stay proceedings pending arbitration, and transfer the case to the District Court for the Northern District of California pursuant to a forum selection clause in Uber's driver agreements. The Massachusetts district court granted Uber's motion to transfer the action to the California district court, including the pending Emergency Motion and Motion to Compel Arbitration. The California district court denied Plaintiffs'

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

request for a preliminary injunction and granted Uber's Motion to Compel Arbitration.

Plaintiffs asserted that they are exempt from mandatory arbitration under Section 1 of the FAA because they are a class of workers engaged in foreign or interstate commerce. The panel disagreed. Rather, the panel joined the growing majority of courts holding that Uber drivers as a class of workers do not fall within the interstate commerce exemption from the FAA.

Section 1 of the Act exempts from its coverage contracts of employment of three categories of workers: seamen, railroad employees, and a residual category comprising any other class of workers engaged in foreign or interstate commerce. The panel noted that the Supreme Court has instructed that this last residual category must be afforded a narrow construction to further the FAA's purpose to overcome judicial hostility to arbitration agreements.

The panel first held that in light of the text of the FAA and Supreme Court precedent, the relevant class of workers here, Uber drivers, needed to be assessed at the nationwide level, rather than confined to any limited geographic region. Limiting the relevant class of workers to a specific geographic area would undermine the very purpose of the FAA, by which Congress sought to create a national policy favoring arbitration.

The panel concluded that Uber drivers, as a nationwide class of workers, are not engaged in foreign or interstate commerce and are therefore not exempt from arbitration under the FAA. Here, the district court's unchallenged factual findings compelled the conclusion that Uber's service was primarily local and intrastate in nature. Only

2.5% of all trips fulfilled using the Uber Rides marketplace in the United States between 2015 and 2019 started and ended in different states. Moreover, only 10.1% of all trips taken in the United States in 2019 began or ended at an airport, not all of which involved interstate travel. Plaintiffs did not (and likely could not) point to any evidence that Uber drivers were sufficiently engaged in interstate commerce to fall under the Section 1 exemption.

The panel next concluded that the district court properly addressed the motion to compel arbitration prior to adjudicating Plaintiffs' preliminary injunction motion. Because Plaintiffs' claims and requested injunctive relief were arbitrable by the terms of the arbitration agreement and Plaintiffs' requested injunctive relief would have upended the status quo rather than maintained it, the panel determined that the district court properly addressed the motion to compel arbitration first.

The panel further held that the district court properly concluded that the proposed injunction against Uber's current driver classification as independent contractors was not one for public injunctive relief. Plaintiffs argued that a claim for public injunctive relief could not be waived contractually under Massachusetts law. The panel held that even assuming class-wide public injunctive relief, as conceptualized in *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), were available under Massachusetts law and that such relief could not be contractually waived, the requested injunctive relief here could not be remotely characterized as public injunctive relief as this court or any other court has recognized it.

Because the panel agreed with the district court that Plaintiffs' requested injunctive relief did not constitute

public injunctive relief, the panel also agreed that Plaintiffs could not evade the Class Action Waiver in Uber's Arbitration Provision, even assuming Massachusetts law provided for such non-waivable relief. Likewise, because Plaintiffs' request for injunctive relief regarding their classification was properly a matter for the arbitrator, the district court did not err by declining to reach the merits of Plaintiffs' request for a preliminary injunction under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

## COUNSEL

Shannon Liss-Riordan (argued), Lichten & Liss-Riordan PC, Boston, Massachusetts, for Plaintiffs-Appellants.

Theane Evangelis (argued), Blaine H. Evanson, Heather Richardson, and Samuel Eckman, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendants-Appellees.

Rohit K. Singla and Dane P. Shikman, Munger Tolles & Olson LLP, San Francisco, California; Jeffrey Y. Wu, Munger Tolles & Olson LLP, Los Angeles, California; Elaine J. Goldenberg, Munger Tolles & Olson LLP, Washington, D.C.; for Amicus Curiae Lyft, Inc.

Kevin Ruf, Glancy Prongay & Murray, Los Angeles, California; Reynaldo Fuentes, Partnership for Working Families, Oakland, California; for Amici Curiae Boston Independent Drivers Guild, Gig Workers Rising, Mobile Workers Alliance, Rideshare Drivers United, and We Drive Progress.

# OPINION

WARDLAW, Circuit Judge:

Few technological advances have transformed the global economy as the internet.  This technological revolution has left an indelible mark on the modern workplace.  We live and work in the wake of this dramatic, digital upheaval, and its transformative power continues to shape the very nature of work itself, likely in ways which we cannot yet perceive.  In less than three decades, companies like Amazon, DoorDash, Google (Alphabet), and Uber, among others, have transformed from nothing more than an entrepreneurial vision into fixtures of the modern economy, becoming household names along the way.

As these new industries have grown, their workforce has ballooned into the millions in America alone, generating countless opportunities and vast fortunes but also raising new questions of law.  With transactions taking place at the speed of light, the once slow-rolling tides of supply and demand now change within minutes or even seconds, leading many of these companies to prize flexibility in their workforce and incentivize part-time work.  This reality has also led to a Dickensian tale of two workforces.  On one side of the divide are those involved in the design and high-level operation of a company's platform, who are almost always deemed "employees," entitling them to certain protections and benefits but at the cost of greater employer control over their activities.  On the other side is a much larger bloc consisting of those who frequently directly transport goods or passengers, the so-called "gig-economy workers," most if not all of whom are classified as "independent contractors," a status conferring flexibility but little security.

As a result, the digital economy has begun to collide with laws designed for the analog age, raising important questions in the process about the relationship between these gig-economy companies and their workers.  That said, the tradeoff between flexibility and security is not always so easily resolved.  Disputes are inevitable given the differences between employees and independent contractors, and many gig-economy workers have unsurprisingly attempted to legally challenge their current classification.

We must now decide *who* will decide those disputes for Uber drivers whose contracts with Uber contain mandatory arbitration provisions. Answering this question requires us to first determine whether Uber drivers fall within the so-called "interstate commerce" exemption to mandatory arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16.  We conclude that they do not.  Because we also conclude that the injunctive relief they requested, reclassification of their status from "independent contractors" to "employees," is not public injunctive relief that may have allowed them to avoid arbitration, we affirm the district court's order compelling arbitration.

## I.

Uber Technologies, Inc. ("Uber") develops app-based platforms to connect "drivers," individuals who provide transportation services, with "riders," those in need of transportation services.  John Capriole, Martin El Koussa, and Vladimir Leonidas ("Plaintiffs") are Massachusetts residents who have worked as Uber drivers since at least May 2016.

Uber classifies all of its Massachusetts drivers, including Plaintiffs, as independent contractors, not employees, under

state law. As independent contractors, the drivers are required to pay business expenses (such as the cost of maintaining their vehicles, gas, insurance, phone and data expenses, as well as other costs), they have no guaranteed minimum wage or overtime premiums, and they do not accrue paid sick leave, as would be required by Massachusetts law.

When they signed up to become Uber drivers, Plaintiffs agreed to Uber's 2015 Technology Services Agreement (the "Agreement"). The Agreement's first page advised Plaintiffs of the mandatory arbitration agreement ("Arbitration Provision"), and the Agreement explicitly specifies that the Arbitration Provision is governed by the FAA.[1] The Arbitration Provision provides, in relevant part, that all disputes between Uber and its drivers are to be resolved through binding and final arbitration pursuant to the terms of the agreement. The Arbitration Provision also contains a "Class Action Waiver," providing that Uber and the signatory "agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective, action, or representative basis" and that the "Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis." However, any disputes about the "enforceability, revocability or validity" of the Class Action

---

[1] The parties do not dispute that the FAA governs the Agreement. But we note that the Arbitration Provision's statement that it "evidences a transaction involving interstate commerce" merely establishes that the contracts between Uber and its drivers sufficiently affect commerce to fall under the FAA's purview. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995) (holding that the FAA only requires that a transaction "in fact" involve interstate commerce). It is not a concession that the work a driver will perform "involv[es] interstate commerce."

Waiver are to be resolved only by courts, and not by an arbitrator. The Agreement also expressly permits any driver who does not wish to be subject to mandatory arbitration to opt out (by mail or email) within 30 days of agreeing to the Arbitration Provision, and provides instructions on how to do so.

Plaintiffs each agreed to the Arbitration Provision in the 2015 Agreement, and none of them opted out. In January 2020, Uber implemented a new Platform Access Agreement, which contained a materially identical arbitration provision. All Plaintiffs again agreed to the new provision, but this time Capriole chose to opt out within 30 days.[2]

In September 2019, Plaintiffs filed a putative class action in the District Court for the District of Massachusetts on behalf of all "individuals who have worked as Uber drivers in Massachusetts who have not released all of their claims against Uber." Plaintiffs simultaneously requested a preliminary injunction prohibiting Uber from "classifying its drivers in Massachusetts as 'independent contractors'" and an order directing "Uber to classify its drivers as employees and comply with Massachusetts wage laws." Plaintiffs claimed Massachusetts Uber drivers are properly considered employees under the state's test for determining whether a

---

[2] The district court correctly found that Capriole remains bound by the 2015 Agreement and its arbitration provisions because of express language in the 2020 agreement providing that any opt-out would not affect pre-existing agreements to arbitration, including the 2015 Agreement.

worker is an employee or independent contractor. *See* Mass. Gen. Laws ch. 149, § 148B.[3]

Plaintiffs claimed that as a result of this misclassification, Uber violated state wage and hour law when it "required drivers to pay business expenses," *see* Mass. Gen. Laws chs. 148, 149, 150, "failed to guarantee and pay its drivers minimum wage for all hours worked," *see id.* ch. 151, § 1, and "failed to pay overtime premiums for hours worked in excess of eight hours per day or forty hours per week," *see id.* ch. 151, § 1A.

When the COVID-19 pandemic struck, Plaintiffs added new claims for paid sick leave under the Massachusetts

---

[3] Commonly referred to as the "ABC" test, owed to the frequent reference to its three prongs as "A, B, C," the Massachusetts statute reads as follows:

> (a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:—
>
> > (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
> >
> > (2) the service is performed outside the usual course of the business of the employer; and,
> >
> > (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

MASS. GEN. LAWS ch. 149, § 148B.

Earned Sick Time Law.[4]    Specifically, Massachusetts requires larger employers to provide "a minimum of one hour of earned sick time for every thirty hours worked by an employee."    Mass. Gen. Laws ch. 149, § 148C(d)(1). Massachusetts employees may accrue and use up to five days (40 hours) of paid sick leave per calendar year.    *Id.* § 148C(d)(4).    Pursuant to Massachusetts' COVID-19 Order No. 13, Uber and other rideshare drivers are considered "essential workforce" in Massachusetts, so they were not subject to any shutdown orders and could continue working throughout the pandemic.    Because they are essential workers, Plaintiffs argued that Uber's alleged misclassification of them as independent contractors "creat[es] an immediate danger, not only to Uber drivers, but to the general public as well."    Specifically, Plaintiffs alleged Uber's failure to provide paid sick leave forced drivers to drive, even if they had experienced COVID-19 symptoms and risked infecting their passengers, because the drivers "need[ed] to continue working in order to support themselves."[5]

Separately, Uber moved to compel arbitration, stay proceedings pending arbitration, and transfer the case to the

---

[4] Although Plaintiffs' briefs largely focus on paid sick leave, Plaintiffs' request for injunctive relief remains broad and would have the court reclassify all drivers as employees for all purposes, not just paid sick leave, unlike many other rideshare driver suits that have sought emergency injunctive relief for reclassification only for the purpose of paid sick leave.    *See, e.g.*, *Cunningham v. Lyft, Inc.*, No. 1:19-cv-11974-IT, 2020 WL 2616302, at *5 (D. Mass. May 22, 2020).

[5] Massachusetts recently lifted most of its remaining COVID-19 restrictions given declining case counts, allowing all businesses to reopen at full capacity.    *See Reopening Massachusetts: All Remaining COVID Restrictions Lifted*, CBSBoston (May 29, 2021), tinyurl.com/4pah9e7b (last accessed June 30, 2021).

District Court for the Northern District of California pursuant to a forum selection clause in Uber's driver agreements. On March 20, 2020, the Massachusetts district court denied Plaintiffs' request for a preliminary injunction, *see Capriole v. Uber Techs., Inc.*, No. 1:19-cv-11941-IT, 2020 WL 1323076, at *1 (D. Mass. Mar. 20, 2020), but, just three days later, Plaintiffs filed a new Emergency Motion for a Preliminary Injunction (the "Emergency Motion"). Shortly thereafter, the Massachusetts district court granted Uber's motion to transfer the action to the California district court, including the pending Emergency Motion and Motion to Compel Arbitration.[6] By this point, Plaintiffs had amended their complaint to add new claims regarding paid sick leave, additional named plaintiffs, and the allegation that "Capriole has driven passengers across state lines while driving for Uber." The California district court denied Plaintiffs' request for a preliminary injunction and granted Uber's Motion to Compel Arbitration. Plaintiffs timely appealed.

## II.

We have jurisdiction under 28 U.S.C. § 1291 because Plaintiffs appeal from a final judgment. A "district court's decision to grant or deny a motion to compel arbitration is reviewed de novo," *Bushley v. Credit Suisse First Bos.*,

---

[6] Despite the transfer, Plaintiffs appealed the Massachusetts district court's denial of their motion for a preliminary injunction to the First Circuit. However, in light of the transfer and the California court's subsequent order compelling arbitration and dismissing the case, the First Circuit dismissed Plaintiffs' appeal as moot. *See Capriole v. Uber Techs., Inc.*, 991 F.3d 339, 344 (1st Cir. 2021) ("The final judgment in California means that the arbitrator, not us or another court, is to decide any claim for relief in this case unless and only if the Ninth Circuit reverses.").

360 F.3d 1149, 1152 (9th Cir. 2004), but "[t]he factual findings underlying the district court's decision are reviewed for clear error," *Bradley v. Harris Rsch., Inc.*, 275 F.3d 884, 888 (9th Cir. 2001). We also review the district court's denial of a preliminary injunction "for [an] abuse of discretion," which "will be found if the district court based its decision 'on an erroneous legal standard or clearly erroneous finding of fact.'" *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)).

## III.

### A.

We begin with the primary question on appeal, whether Plaintiffs' claims are subject to mandatory arbitration. Plaintiffs assert that they are exempt from mandatory arbitration under Section 1 of the FAA because they are a "class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. We disagree. Rather, we join the growing majority of courts holding that Uber drivers as a class of workers do not fall within the "interstate commerce" exemption from the FAA. *See Osvatics v. Lyft, Inc.*, No. 20-cv-1426 (KBJ), 2021 WL 1601114, at *8 (D.D.C. Apr. 22, 2021) (collecting cases).[7]

---

[7] We address only whether Uber drivers, as a class of workers, are "engaged in foreign or interstate commerce" and are therefore exempt from the FAA. We are not presented with the question of whether drivers for app-based food delivery services or other local courier services fall under the interstate commerce exemption, but our precedent, along with that of at least one other circuit, suggests that such workers similarly do not fall under the exemption. *See Rittmann v. Amazon.com, Inc.*,

While Massachusetts law forms the substantive basis for Plaintiffs' claims, their disputes regarding Uber's Arbitration Provision are governed by the FAA, which "places arbitration agreements on an equal footing with other contracts, requiring courts to enforce them according to their terms." *In re Grice*, 974 F.3d 950, 953 (9th Cir. 2020). But Section 1 of the Act "exempts from its coverage 'contracts of employment' of three categories of workers: 'seamen,' 'railroad employees,' and a residual category comprising 'any other class of workers engaged in foreign or interstate commerce.'" *Id*. (quoting 9 U.S.C. § 1). We have described this last category as the "residual clause." *Id.* at 955. The Supreme Court has instructed that the residual clause must "be afforded a narrow construction" to further the FAA's purpose "to overcome judicial hostility to arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) (quoting *Allied-Bruce*, 513 U.S. at 272–73). In affording such a narrow construction, the Court cautioned that "[t]he plain meaning of the words 'engaged in commerce'" in Section 1 "is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'" *Id*. (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).

When deciding whether the exemption applies, "the critical factor [is] not the nature of the item transported in interstate commerce (person or good) or whether the plaintiffs themselves crossed state lines, but rather '[t]he nature of the business for which a class of workers perform[ed] their activities.'" *Grice*, 974 F.3d at 956 (second and third alterations in original) (quoting *Waithaka*

---

971 F.3d 904, 916 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374 (2021); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802–03 (7th Cir. 2020).

*v. Amazon.com, Inc.*, 966 F.3d 10, 22 (1st Cir. 2020)); *see also Wallace*, 970 F.3d at 800 ("[T]he question is 'not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce.'" (quoting *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988)). We have applied this clause to "the contracts of employees who actually transport *people or goods* in interstate commerce." *Craft v. Campbell Soup Co.*, 177 F.3d 1083, 1085 (9th Cir. 1998) (per curiam) (emphasis added), *abrogated on other grounds by Circuit City*, 532 U.S. at 121. In sum, the analysis focuses on the inherent nature of the work performed and whether the nature of the work primarily implicates inter- or intrastate commerce.

*1. The Scope of the "Class of Workers" at Issue*

However, before we can determine whether Uber drivers are engaged in interstate commerce as a class, we must first define the scope of the relevant "class of workers." Plaintiffs only purport to represent a putative statewide (Massachusetts) class of Uber drivers. On the occasions in which we have previously analyzed whether a category of workers falls within the exemption, we have been confronted only with a putative *nationwide* class of workers. *See, e.g.*, *Rittmann*, 971 F.3d at 908. Accordingly, we have had the opportunity to consider classes of workers only at the nationwide level. In light of the text of the FAA and Supreme Court precedent, we see no reason for our analysis to change, where, as here, we face only a putative statewide class. We therefore conclude that we must assess the relevant "class of workers" here, Uber drivers, at the nationwide level, rather than confine it to any limited geographic region.

16          CAPRIOLE V. UBER TECHNOLOGIES

In *Circuit City*, the Supreme Court instructed that the residual category of "any other class of workers" under Section 1 of the FAA is "controlled and defined by reference to the enumerated categories of workers which are recited just before it," *i.e.*, "seamen" and "railroad employees." 532 U.S. at 115. As those terms contain "no geographic limitations," "the most natural inference is that Congress intended those terms to encompass *all* seamen and railroad employees nationwide." *Osvatics*, 2021 WL 1601114, at *10. Giving the same construction to the "other class of workers" referenced in Section 1, this category of workers must similarly be assessed at a nationwide level, rather than any narrow, geographic region.

Indeed, if we were to limit the relevant class of workers to a specific geographic area, we would undermine the very purpose of the FAA, by which Congress sought to create a "*national* policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (emphasis added). We therefore agree with the district court in *Osvatics* that it "seems unlikely that Congress would have wanted the applicability of the section 1 exemption—and thus the enforceability of a given arbitration agreement—to vary by geographical region." 2021 WL 1601114, at *11. Such a logical underpinning is likely why all courts addressing this question, even those that have ultimately concluded that Uber drivers do fall within the interstate commerce exemption, have rejected attempts to cabin their analyses to a specific geographic area. *See Osvatics*, 2021 WL 1601114, at *10 (collecting cases).

Any alternative approach would potentially produce absurd results whereby the FAA would apply differently to neighboring states, or even neighboring cities in the same state. It would also introduce uncertainty into labor and

employment contracts across the country by sowing doubt as to the enforceability of any arbitration agreement depending on where a particular lawsuit was filed or the scope of any putative class.  Such an approach would "undermine[] both the certainty and predictability which arbitration agreements are meant to foster."  *Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 223 (1st Cir. 1995); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (counseling courts to avoid inviting "unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages" that would "damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements" (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 517 (1974))).

### 2.  Whether Uber Drivers Are Engaged in Foreign or Interstate Commerce

We conclude that Uber drivers, as a nationwide "class of workers," are not "engaged in foreign or interstate commerce" and are therefore not exempt from arbitration under the FAA.  9 U.S.C. § 1.  Plaintiffs' argument to the contrary is premised on the fact that Uber drivers sometimes cross state lines or pick up and drop off passengers at airports who are heading to (or returning from) interstate travel.  Although it arose in the "highly deferential" context of a mandamus petition, our decision in *Grice* is instructive and its reasoning persuasive.  974 F.3d at 954.  In *Grice*, we held a district court's conclusion that "rideshare drivers who pick up and drop off passengers at airports do not fall within this residual category" was not "clearly erroneous as a matter of law."  *Id.* (quoting *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977)).

In so concluding, we based much of our reasoning on *United States v. Yellow Cab Co.*, an antitrust case in which the Supreme Court held that the transportation of interstate rail passengers and their luggage between rail stations in Chicago to facilitate their travel is part of "the stream of interstate commerce." 332 U.S. 218, 228–29 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). Important to the Supreme Court's conclusion was that the passengers contracted directly with the railroad for this "between-station transportation in Chicago" that was exclusively provided by a single company, itself contracting directly with the railroad. *Id.* at 228–29. Thus, because the alleged restraint of trade sought to "eliminate competition . . . for supplying transportation for this transfer in the midst of interstate journeys," the Supreme Court held that the plaintiffs had plausibly alleged an unlawful restraint of interstate commerce under the Sherman Act. *Id.* at 229.

By contrast, addressing a related antitrust challenge against local taxicab operators in Chicago, the Supreme Court also held that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." *Id.* at 233. The Supreme Court also noted that none of the cab companies "serve[d] only railroad passengers, all of them being required to serve 'every person' within the limits of Chicago." *Id.* at 231. The companies had "no contractual or other arrangement with the interstate railroads." *Id.* "Nor [were] their fares paid or collected as part of the railroad fares," and "in short, their relationship to interstate transit [was] only casual and incidental." *Id.* Because the plaintiffs in *Yellow Cab* failed to show how "local taxicab service" was "an integral part of

interstate transportation," the Supreme Court concluded that the plaintiffs failed to state a cause of action under the Sherman Act.  *Id*. at 233.

We think rideshare drivers are less like the exclusive provider of "between-station transportation" described in *Yellow Cab* and more like a "local taxicab service."  *Id*. at 228, 233.  Therefore, Uber drivers, as a class, "are not engaged in interstate commerce" because their work "predominantly entails intrastate trips," even though some Uber drivers undoubtedly cross state lines in the course of their work and rideshare companies do contract with airports "to allow Uber drivers . . . to pick up arriving passengers." *Grice*, 974 F.3d at 956–58 (quoting *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020)); *see also Aleksanian v. Uber Techs. Inc.*, No. 1:19-cv-10308 (ALC), 2021 WL 860127, at *8 (S.D.N.Y. Mar. 8, 2021) ("[J]ust because Uber is set up to handle the occasional interstate trip does not mean that 'interstate [commerce] is a central part of the job description of the class of workers to which [Plaintiffs] belong.'" (third alteration in original) (quoting *Wallace*, 970 F.3d at 803)).

The Third Circuit's decision in *Singh v. Uber Technologies Inc.*, cited by Plaintiffs, is not inapposite.  939 F.3d 210 (3d Cir. 2019).  In *Singh*, the Third Circuit held that Uber or other rideshare drivers *could* fall under the FAA's interstate commerce exemption but did not hold that rideshare drivers categorically fall within the exemption.  *Id*. at 227.  Rather, in *Singh*, the Third Circuit vacated the district court's order compelling arbitration and remanded the case for discovery on "whether Singh belongs to a class of transportation workers engaged in interstate commerce," based on Singh's affidavit that "he frequently transported passengers on the highway across state lines, between New

York and New Jersey." *Id.* at 226–27. The Third Circuit directed the district court to examine "the contents of the parties' agreement(s), information regarding the industry in which the class of workers is engaged, information regarding the work performed by those workers, and various texts— *i.e.*, other laws, dictionaries, and documents—that discuss the parties and the work." *Id*. at 227–28. Thus, *Singh* stands only for the proposition that any interstate commerce exemption inquiry must focus on the district court's factual findings regarding the extent of interstate work. *Id*.

Here, the district court's unchallenged factual findings compel the conclusion that Uber's service is primarily local and intrastate in nature. Only 2.5% of "all trips fulfilled using the Uber Rides marketplace in the United States between 2015 and 2019 . . . started and ended in different states." Moreover, "only 10.1% of all trips taken in the United States in 2019 began or ended at an airport," not all of which involved interstate travel. For example, some trips to and from the airport are taken by airport employees and passengers traveling solely on intrastate flights. Overall, interstate trips, even when combined with trips to the airport, represent a very small percentage of Uber rides, and only occasionally implicate interstate commerce. Furthermore, the record demonstrates that even Uber trips "that started and ended in different states" are inherently local in nature as "the average distance was approximately 13.5 miles and the average duration was approximately 30.0 minutes." Even these statistics are likely influenced by the fact that many interstate trips are performed by drivers (or for riders) who live close to state borders, especially on the East Coast. For this reason, we agree with the district court in *Rogers v. Lyft Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020), that "[i]nterstate trips that occur by happenstance of geography do not alter

the intrastate transportation function performed by the class of workers." *Id*. at 916.

Given this background, Uber drivers, even when crossing state lines or transporting passengers to airports, are "merely convey[ing] interstate . . . passengers between their homes and [their destination] in the normal course of their independent local service." *Yellow Cab*, 332 U.S. at 233; *see also Rogers*, 452 F. Supp. 3d at 916 ("[Uber] is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers."). Thus, interstate movement cannot be said to be a "central part of the class members' job description." *Wallace*, 970 F.3d at 801. As almost any user of Uber's product would attest, Uber trips are often short and local, and they only infrequently involve either crossing state lines or a trip to a transportation hub, as the evidence demonstrates. And "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work." *Id*. at 800 (citing *Hill v. Rent-A-Ctr.*, 398 F.3d 1286, 1289–90 (11th Cir. 2005)). As we have said, "'the residual exemption is . . . about what the worker does,' not just 'where the goods [or people] have been.'" *Grice*, 974 F.3d at 958 (omission and alteration in original) (quoting *Wallace*, 970 F.3d at 802). By contrast, for the other enumerated categories of workers in Section 1, seamen and railroad workers, the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and "central part of the job description." *Wallace*, 970 F.3d at 803.

Indeed, Plaintiffs do not (and likely cannot) point to any evidence that Uber drivers are sufficiently "engaged in interstate commerce" to fall under the Section 1 exemption.

*Grice*, 974 F.3d at 958. Plaintiffs point to (for the first time on appeal) several advertisements as to partnership agreements from 2016 and 2017 between Uber and certain airlines. The first is a March 2017 press release from an Indian airline, Jet Airways, purportedly demonstrating that Jet Airways passengers are able to use the airline's app to request an Uber when booking their flight. The second is an offer from American Airlines for a free $20 Uber ride credit for select passengers. But nothing about the submitted materials indicates the type of commercial relationship described in *Yellow Cab* that would implicate interstate commerce. Plaintiffs did not rely on this evidence below, and so we do not have any record (or even allegation) that Uber's fares were "paid or collected as part of the [airline's] fares." *Yellow Cab*, 332 U.S. at 231. As we noted in *Grice*, "[a]lthough Uber entered into agreements with the . . . airports to allow Uber drivers like [Plaintiffs] to pick up arriving passengers, [Plaintiffs] do[] not contend that [their] passengers contracted with the airlines to hire [them]." *Grice*, 974 F.3d at 958.

However, even with this material, there is no evidence that Uber exclusively contracted with airlines such that its drivers would "serve[] only [airport] passengers" or otherwise participate in a single, unbroken stream of interstate commerce. *Yellow Cab*, 332 U.S. at 231; *see also Rogers*, 452 F. Supp. 3d at 916 (contrasting the unaffiliated nature of rideshare trips to "people who drive for an airport shuttle service" who "might constitute a class of transportation workers engaged in interstate commerce" by means of "the interstate character of that nominally intrastate activity"). Indeed, without any affiliation with the airlines or other contractual arrangement, Plaintiffs have not demonstrated the "practical, economic continuity" required to establish that they are engaged in interstate commerce.

*Gulf Oil*, 419 U.S. at 195; *see also Osvatics*, 2021 WL 1601114, at *15 ("[T]here must be an established link between such intrastate rideshare trips and the channels of commerce that are designed to facilitate passengers' interstate journeys.").

For these same reasons, we find the analysis of the minority of district courts that have found to the contrary unpersuasive. They assign too much weight to the fact that rideshare drivers occasionally perform interstate trips or trips to transportation hubs. Moreover, they do *not* consider whether the trips form part of a single, unbroken stream of interstate commerce that renders interstate travel a "central part" of a rideshare driver's job description. *See, e.g.*, *Islam v. Lyft, Inc.*, No. 20-cv-3004 (RA), 2021 WL 871417, at *7 (S.D.N.Y. Mar. 9, 2021) (suggesting that "a class of transportation workers" that only "perform more than a *de minimis* amount of interstate transportation" may be "found to be 'engaged in . . . interstate commerce'" (omission in original)); *Haider v. Lyft, Inc.*, No. 20-cv-2997 (AJN), 2021 WL 1226442, at *3 (S.D.N.Y. Mar. 31, 2021) (focusing largely on the aggregate "sheer number of interstate trips rideshare drivers make" across the country while inexplicably limiting the analysis to "full-time" drivers); *Cunningham v. Lyft, Inc.¸* 450 F. Supp. 3d 37, 46 (D. Mass. 2020) (focusing only on the "continuity of movement" of rideshare trips to and from the airport as part of a broader, interstate trip to conclude that Lyft drivers are engaged in interstate commerce).[8]

---

[8] The district court in *Cunningham* relied on a misinterpretation of *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943). In fact, all *Walling* suggests is that an "interstate journey is not ended by reason of a temporary holding of the goods [shipped across state lines] at [a]

Our conclusion also comports with our recent decision in *Rittmann*. There, we joined the First Circuit and held that Amazon Flex ("AmFlex") workers did fall under the interstate commerce exemption due to the interstate nature of Amazon's business. *Rittmann*, 971 F.3d at 917–18. We reasoned that "AmFlex workers complete the delivery of goods that Amazon ships across state lines and for which Amazon hires AmFlex workers to complete the delivery" as the last leg of a single, unbroken stream of interstate commerce coordinated by Amazon from origin to destination. *Id*. at 917. In *Waithaka*, in which the First Circuit articulated the approach we adopted in *Rittman*, Amazon "never contested that products . . . AmFlex workers deliver cross state lines to reach their final destinations." 966 F.3d at 26 n.11. By contrast, Uber stalwartly objects to any notion that interstate transportation is intrinsic to its service, and Plaintiffs have proffered no evidence undermining Uber's position. Moreover, even when

---

warehouse" before subsequent shipment to customers within the same state as the warehouse. 317 U.S. at 569. Thus, *Walling* merely held that an enterprise cannot transform interstate transactions into intrastate trade, thereby avoiding laws applicable to interstate commerce, merely by means of a brief pause at a same-state warehouse before shipping them on. It does not stand for the establishment of a "practical continuity of movement" test for interstate commerce. *But see Cunningham*, 450 F. Supp. 3d at 46 (characterizing *Walling* as "holding that goods remain in interstate commerce where there is a practical continuity of movement"). Interpreting *Walling* in this way accords with *Yellow Cab* because the wholesale business in *Walling* appeared to control every leg of the interstate shipment from origin to destination, and therefore the temporary warehousing of a shipment merely represents a link in a single, unbroken chain of interstate commerce, similar to Amazon in *Rittmann*. *See Walling*, 317 U.S. at 569–71; *Rittmann*, 971 F.3d at 917–18. Not only did the district court in *Cunningham* misread *Walling*, but it did not discuss or even mention *Yellow Cab*, the reasoning of which is indispensable to the outcome of this case.

transporting passengers to and from transportation hubs as part of a larger foreign or interstate trip, Uber drivers are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce like AmFlex workers. *See Rittmann*, 971 F.3d at 917.

B.

Plaintiffs also challenge the district court's refusal to adjudicate their preliminary injunction motion before it granted Uber's motion to compel arbitration. Because Plaintiffs' claims and requested injunctive relief are arbitrable by the terms of the arbitration agreement and Plaintiffs' requested injunctive relief would have upended the status quo rather than maintained it, we think that the district court properly addressed the motion to compel arbitration first.

As we held in *Toyo Tire Holdings of Americas, Inc. v. Continental Tire North America, Inc.*, "a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided, of course, that the requirements for granting injunctive relief are otherwise satisfied." 609 F.3d 975, 981 (9th Cir. 2010). Because the injunctive relief sought by Plaintiffs, *i.e.*, immediate reclassification as employees, is arbitrable by the terms of Uber's Arbitration Provision and those terms limit the ability of a court to provide interim relief, *Toyo* controls. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that courts "must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms" (citation omitted)).

In *Toyo*, we reversed a district court's holding that it did not have "the authority to grant injunctive relief to maintain the status quo pending arbitration" based on its erroneous reading of *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999). *Toyo*, 609 F.3d at 979. In both *Toyo* and *Simula*, the parties had agreed to mandatory arbitration subject to the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"), Article 23(2) of which allows parties to petition a court for "interim or conservatory measures" before the dispute is heard by the arbitrator(s). *Toyo*, 609 F.3d at 979 (emphasis omitted); *see also Simula*, 175 F.3d at 725. Addressing whether Article 23(2) allows a federal court to provide any injunctive relief, we concluded in *Toyo* that "a court may grant interim relief," but only "to maintain the status quo while the parties are awaiting the creation of an arbitration panel and a decision by that panel with respect to injunctive relief." 609 F.3d at 980–81. However, this rule led to different outcomes in *Toyo* and *Simula* based on their respective facts.

*Simula* involved a suit by a safety technology developer against an auto parts supplier, alleging that the latter, among other things, stole the developer's ideas, violated its trademark, and unlawfully restrained trade in violation of the Sherman Act. *See* 175 F.3d at 719. Under these circumstances, we affirmed a district court's denial of injunctive relief pending commencement of arbitration proceedings because "the arbitration panel did have power to afford the interim relief [the plaintiff] sought" and because "nothing suggested any imminent need for injunctive relief to maintain the status quo until an arbitration panel could address [the plaintiff's] request for interim relief." *Toyo*, 609 F.3d at 980 (discussing *Simula*, 175 F.3d at 719, 725).

By contrast, *Toyo* involved a rapid breakdown of a tire manufacturing and distribution partnership where the defendants controlled the manufacture of the plaintiff's main product and outright denied the plaintiff's right "to purchase nearly 290,000 tires, or 60% of its North American supply of TBR tires, after Toyo had purchased tires from [the manufacturer] for over twenty years." *Id.* at 980. Given the reality that "the selection of arbitrators and the constitution of the arbitral panel necessarily takes time," the plaintiff in *Toyo* could have "los[t] its customers before interim relief [from the arbitral panel was] possible," a result that would "defeat any ultimate award." *Id.* at 981. Thus, we held that the district court could "issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process," and, in doing so, aligned our court with the uniform conclusions of our sister circuits. *Id.* at 981–82 (collecting cases).

Here, the district court correctly refused to resolve Plaintiffs' request for injunctive relief before deciding the motion to compel arbitration. Language in Uber's Arbitration Provision parallels Article 23 of the ICC Rules, authorizing courts to grant interim relief but strictly limiting it to measures that preserve the status quo. The Arbitration Provision provides that "[a] party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, *but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.*" (emphasis added). Thus, as in *Toyo*, Uber's Arbitration Provision covers requests for emergency relief, and the district court therefore had power to grant interim, injunctive relief only if "necessary to

preserve the status quo" until the case could be heard by an arbitrator, emergency or otherwise.  609 F.3d at 981.

This case is more like *Simula* than *Toyo*.  Here, "the delay associated with securing an arbitration panel's ruling on interim relief" would not "defeat any ultimate award," particularly in light of the fact that Plaintiffs seek *all* benefits of classification as employees, not just paid sick leave. *Toyo*, 609 F.3d at 981.  As the district court astutely noted, an injunction mandating that Uber re-classify all of its Massachusetts drivers as employees, after years of operating with drivers classified as independent contractors and with the magnitudinous attendant changes to their pay and benefits, would "upend, rather than preserve, the status quo." Moreover, it would certainly fail to "preserve the meaningfulness of the arbitral process."  *Toyo*, 609 F.3d at 980.

## C.

Plaintiffs attempt to elide the FAA's requirements (and any order compelling arbitration) by styling their request for injunctive relief as one for "public injunctive relief," which they assert cannot be waived under Massachusetts law, and thus would preclude arbitration here.  However, the district court properly concluded that the proposed injunction against Uber's current driver classification as independent contractors Plaintiffs sought was not one for "public injunctive relief."

Under the FAA, a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA enshrines "a liberal federal policy

favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *accord Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019). Indeed, the Supreme Court has recognized that arbitration agreements may contain waivers of the class action mechanism and require the parties to pursue their claims individually. *See Epic Sys.*, 138 S. Ct. at 1619 ("In the Federal Arbitration Act, Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings."). Uber's 2015 Agreement contains such a class action waiver, providing that "[t]he Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis."

Nevertheless, Plaintiffs argue that their request for preliminary relief classifying them as employees is one for "public injunctive relief," which they argue cannot be waived contractually under Massachusetts law. Plaintiffs' primary support for this argument is a California Supreme Court decision, *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), which held that waiver of public injunctive relief "in *any* contract—even a contract that has no arbitration provision" is "unenforceable under California law." *Id.* at 94. Analyzing three California consumer protection statutes, the court explained that public injunctive relief is "injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." *Id.* at 87 (first citing *Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1164–65 (Cal. 2003); and then citing *Broughton v. Cigna Health. of Cal.*, 988 P.2d 67, 74 (Cal. 1999)). "Its 'evident purpose' . . . is 'to remedy a public wrong,' 'not to resolve a private dispute,' and any benefit to the plaintiff requesting such relief 'likely . . .

would be incidental to the general public benefit of enjoining such a practice.'" *Id*. at 94 (second omission in original) (internal citation omitted) (quoting *Broughton*, 988 P.2d at 76 & n.5). As such, *McGill* reasoned, the availability of class-wide public injunctive relief cannot be waived by a "predispute arbitration agreement." *Id*. at 94. The *McGill* court was also careful to note that the three statutes recognized as containing a public injunction provision—the Consumer Legal Remedies Act ("CLRA"), the Unfair Competition Law, and the False Advertising Law—all involve protections against misleading and deceptive practices, where an injunction will provide a meaningful benefit primarily (and potentially only) to the public "because the plaintiff has 'already been injured, allegedly, by such practices and [is] aware of them.'" *Id*. at 90 (alteration in original) (quoting *Broughton*, 988 P.2d at 76 n.5).

Plaintiffs invoke *McGill* to argue that the injunctive relief they seek, reclassification as employees on a class-wide basis, similarly cannot be waived under Uber's Arbitration Provision. But their argument is unavailing. To start, as the Massachusetts district court noted, it is debatable whether the relevant Massachusetts law, the Wage Act, even provides for public injunctive relief. *See Capriole*, 2020 WL 1323076, at *3 ("The [Wage Act] explicitly contemplates class-wide relief but includes no provisions that allow for injunction for the public benefit."). That said, the Massachusetts Attorney General submitted an amicus brief in the Massachusetts district court in support of Plaintiffs' position, arguing that the law under review in *McGill*—specifically the CLRA—has parallel language to the Earned Sick Time Law and thus does provide for public injunctive

relief that cannot be waived.[9]  And, as Plaintiffs correctly note, the Massachusetts Supreme Judicial Court has held that as "the department charged with enforcing the wage and hour laws," the Attorney General's interpretation of those laws "is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions."  *Smith v. Winter Place LLC*, 851 N.E.2d 417, 421 (Mass. 2006).[10]

However, we need not resolve how the Massachusetts Supreme Judicial Court would rule on this question because, even assuming class-wide public injunctive relief, as conceptualized in *McGill*, were available under Massachusetts law and that such relief may not be contractually waived, Plaintiffs' requested injunctive relief cannot be remotely characterized as "public injunctive relief" as we have recognized it, or as has any other court for

---

[9] Specifically, the Massachusetts Attorney General noted that the CLRA authorizes an injured consumer to sue for "[a]n order enjoining [a company's unlawful] methods, acts, or practices," Cal. Civ. Code § 1780(a)(2), and provides that "[a]ny waiver by a consumer" of the CLRA's provisions "is contrary to public policy and shall be unenforceable and void," *id.* § 1751.  By comparison, the Massachusetts Earned Sick Time Law allows an individual to "institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred . . . and other benefits."  MASS. GEN. LAWS ch. 149, § 150.  The Massachusetts Misclassification Statute provides that the Massachusetts Attorney General's civil and criminal enforcement authority does not "limit the availability of other remedies at law or in equity."  *Id.* ch. 149, § 148B(e).

[10] Adding to the uncertainty of any conclusion about Massachusetts state law on this question (were we to draw one), the level of deference owed to the Attorney General's interpretation is not clear and depends on the circumstances of a particular case.  *See ENGIE Gas & LNG LLC v. Dep't of Pub. Utils.*, 56 N.E.3d 740, 751 (Mass. 2016).

that matter.   As we noted in *Blair*, in which we held California's recognition of public injunctive relief was not preempted by the FAA, "[o]ne key difference between a private and public injunction is the primary beneficiary of the relief."  928 F.3d at 824.  On the one hand, "[p]rivate injunctions 'resolve a private dispute' between the parties and 'rectify individual wrongs,' though they may benefit the general public incidentally." *Id*. (quoting *McGill*, 393 P.3d at 89).  "By contrast, public injunctions benefit 'the public directly . . . ,' but do not otherwise benefit the plaintiff . . . ." *Id*. (quoting *McGill*, 393 P.3d at 90).

Against this standard, the district court correctly concluded that Plaintiffs' requested injunctive relief is not one for "public injunctive relief."  Here, the relief sought by Plaintiffs—to "enjoin Uber from misclassifying its drivers as independent contractors, thus entitling them to the protections of Massachusetts wage laws, including paid sick leave"—is overwhelmingly directed at Plaintiffs and other rideshare drivers, and they would be the "primary beneficiar[ies]" of access to overtime and minimum wage laws. *Blair*, 928 F.3d at 824.  The public health implications of paid sick leave, which would not even begin to accrue for months, only "benefit the general public incidentally." *Id*.[11]

---

[11] Though it does not affect our analysis, Plaintiffs' claimed public health benefits of reclassification are further belied by the declining incidence and risk of COVID-19—a feat that is in no small part owed to the herculean efforts of healthcare professionals and America's widespread vaccination campaign.   Indeed, in Massachusetts, approximately 63% of the population isnow fully vaccinated, a similar (and commendable) rate to neighboring states that would presumably form the destination (or origin) of any interstate trips for Massachusetts Uber drivers. *See How Vaccinations Are Going in Your County and State*, NY Times, tinyurl.com/hxj742e (last accessed and updated June 30, 2021).

Such relief plainly does not constitute "public injunctive relief," and *McGill* would therefore not even control if we were applying California law. *Id*. Indeed, California state courts applying *McGill* have reached the same conclusion with regard to employment laws, including one decision directly addressing rideshare drivers. *See, e.g.*, *Rogers v. Lyft, Inc.*, No. CGC-20-583685, 2020 WL 2532527, at *4 (Cal. Super. Ct. Apr. 30, 2020) ("The request for injunctive relief directing Lyft to reclassify its drivers is likewise directed to Plaintiffs and other Lyft drivers as individuals, not to the general public . . . . [It] therefore seeks private, not public, injunctive relief."); *Clifford v. Quest Software Inc.*, 251 Cal. Rptr. 3d 269, 278 (Ct. App. 2019) (holding that "public interest and any incidental benefit to the public from ensuring Quest's compliance with wage and hour laws d[id] not transform Clifford's private UCL injunctive relief claim into a public one under the definitions of public and private injunctive relief articulated by our Supreme Court in *Broughton, Cruz,* and *McGill*"), *review denied*, No. S258542 (Cal. Nov. 13, 2019).

Because we agree with the district court that Plaintiffs' requested injunctive relief does not constitute "public injunctive relief," we also agree that Plaintiffs cannot evade the Class Action Waiver in Uber's Arbitration Provision, even assuming Massachusetts law provided for such non-waivable relief. Likewise, because Plaintiffs' request for injunctive relief regarding their classification was properly a matter for the arbitrator, the district court did not err by declining to reach the merits of Plaintiffs' request for a preliminary injunction under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

## IV.

In sum, the district court properly granted Uber's motion to compel arbitration.  In doing so, it properly addressed Uber's motion to compel arbitration prior to addressing Plaintiffs' emergency motion for a preliminary injunction, and properly concluded that Uber drivers do not fall within the interstate commerce exemption to the FAA, and that Plaintiffs' requested injunctive relief—reclassification as employees—does not constitute "public injunctive relief." The parties shall each bear their costs of appeal.

**AFFIRMED.**